## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARGORY MUHAW,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:12-2214** |
| **vs.** | : | **(JUDGE MANNION)** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

### BACKGROUND

The record in this action has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying Plaintiff Margory Muhaw's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§401-433, 1381-1383f. For the reasons set forth below, the court has determined that the decision of the Commissioner is not supported by substantial evidence and the case will be remanded to the Commissioner for further consideration of the medical evidence and the opinion of a treating physician.

Muhaw protectively filed her applications for DIB and SSI on May

28, 2009. Tr. 73-74 and 121-135.[1] In the present applications for DIB and SSI Muhaw claims that she became disabled on December 5, 2008. Tr. 121 and 128. Muhaw contends that she is disabled because of both physical and mental impairments and she identified depression, anxiety, attention deficit hyperactivity disorder, and insomnia as her mental health impairments and back and leg pain, involving degenerative disc disease, scoliosis, and spinal and foraminal stenosis, and urinary incontinence and allergies, as her physical impairments. Tr. 15, 32, 35-36, 41, 142, 161 and 224; Doc. 10, Plaintiff's Brief, p. 2.

The present applications were initially denied by the Bureau of Disability Determination on November 17, 2009. Tr. 12 and 76-85. On January 6, 2010, Muhaw requested a hearing before an administrative law judge ("ALJ"). Tr. 86-87. A hearing was held before an ALJ on March 18, 2011. Tr. 27-58. Muhaw was represented by counsel at the hearing. Id. On March 29, 2011, the ALJ issued a decision denying Muhaw's applications.[2]

_____

[1]References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on January 10, 2013.

[2]The record reveals that Muhaw filed three prior applications for DIB, two of which were denied at the initial stage and one at the hearing level. Tr. 32, 157 and 266. It is undisputed that the date last insured is March 31, 2009. Doc. 10, Plaintiff's brief, p. 1. There was no discussion at the administrative hearing or in the ALJ's decision as to whether or not those prior decisions were res judicata

Tr. 12-22. The ALJ , after considering the medical records and the testimony of Muhaw and a vocational expert, found that Muhaw had the functional ability to engage in sedentary employment, and consequently, she was not disabled under the Act. Tr. 22 and 54.

On May 31, 2011, Muhaw filed a request for review with the Appeals Council. Tr. 8 and 250-252. The Appeals Council on September 5, 2012, concluded that there was no basis upon which to grant Muhaw's request for review. Tr. 1-5. Thus, the ALJ's decision stood as the final decision of the Commissioner.

Muhaw then filed a complaint in this court on November 6, 2012. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on April 11, 2013, when Muhaw elected not to file a reply brief.

Muhaw was born on April 20, 1967, and at the time of the administrative hearing was 43 years of age. Tr. 33 and 76. Although Muhaw

---

or to reopen or reconsider them. 20 C.F.R § 404.987(b) states in pertinent part that a decision may be reopened on the ALJ's "own initiative" under certain conditions. Those conditions are "[w]ithin 12 months of the notice of the initial determination[] for any reason" and "[w]ithin four years of the date of the notice of the initial determination" for "good cause." 20 C.F.R. §404.988.  The definition of "good cause" includes when "new and material evidence" is presented and when "[t]he evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. §404.989(a)(1),(3).

withdrew from school after completing the 10th grade and never obtained a General Equivalency Diploma, she can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 34-35, 160 and 193. During her elementary and secondary schooling, Muhaw attended regular education classes. Tr. 166. After withdrawing from school Muhaw did not complete "any type of special job training, trade or vocational school." Id.

Muhaw's work history covers 17 years and at least 11 different employers. Tr. 136-137 and 144-146. The records of the Social Security Administration reveal that Muhaw had earnings in the years 1985 through 1993, 1997, 1999 through 2004, and 2008 through 2009. Tr. 136.

The vocational expert who testified at the administrative hearing identified Muhaw's past work as follows: (1) waitress described as semiskilled, light work; (2) cook described as semiskilled, light work; (3) housekeeper described as unskilled, light work; (4) laundry folder described as unskilled, light work; (5) cashier described as unskilled, light work; (6) assistant manager described as skilled, light work; and (7) meat clerk described as unskilled, medium work. Tr. 51-52.

The impetus for Muhaw's alleged disability is two work-related injuries sustained while lifting heavy objects, one which occurred in 2001 and the second in 2003. Tr. 36-37, 39, 541 and 597. After the injury in 2003, Muhaw terminated her employment at the beginning of 2004 and did not engage in any employment until 2008. Tr. 203 and 213. In 2008, Muhaw worked part-time approximately six months (from June to early December, 2008) as a waitress. She terminated that employment on December 5, 2008 "because of her condition." Tr. 136, 161 and 203. She reported that she suffered from depression; she could not lift or bend; she could not walk, stand or sit for long periods of time; she had shooting pains in her back and that laying down was the only thing which relieved her pain; and her pain as well as the pain medications made it hard for her to concentrate. Tr. 161. Muhaw then worked part-time during the 3rd and 4th quarter of 2009 and the 1st quarter of 2010 as a housekeeper at a hotel and earned $2265.03 in 2009 and $78.00 in 2010. Tr. 14, 136, 143 and 203. Muhaw testified at the administrative hearing that she stopped working part-time as a housekeeper because her "back couldn't do it." Tr. 46. The ALJ found that Muhaw's work in 2009 and 2010 was an unsuccessful work attempt and did not amount to substantial gainful activity.

In finding that Muhaw was not disabled, the ALJ rejected the opinion of Matthew J. Kraynak, D.O., a treating physician who found that Muhaw was not capable of performing sustained sedentary work on a regular and continuing basis. Tr. 19-20. One of the reasons given for rejecting the opinion of Dr. Kraynak was that throughout 2009 Dr. Kraynak reported that Muhaw had a normal gait and noted mild decreased range of motion in Muhaw's cervical and lumbar spine as well as back spasms. Tr. 18. Also, the ALJ found that Dr. Kraynak from 2009 until 2011 did not report any changes in Muhaw's musculoskeletal or neurological symptoms. Id. As will be detailed below, those findings by the ALJ were erroneous.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. §405(g) is to determine whether those findings are supported by "substantial evidence."

Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an

adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. §416.920; Poulos, 474 F.3d at 91-92. This process

requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Muhaw commenced receiving medical care and treatment from Dr. Kraynak in September, 2003, and continued to receive regular treatment from Dr. Kraynak through January, 2011. Tr. 454 and 541. Dr. Kraynak's treatment notes of September 4, 2003, indicate that Muhaw was working on August 12, 2003, at Advance Auto Parts in Shenandoah when she injured her back while lifting merchandise. Tr. 541. The record also reveals that Muhaw injured her back lifting a box of bacon in 2001 when working as a meat clerk. Tr. 597. Dr. Kraynak at the initial appointment in September, 2003, reported that Muhaw complained of neck pain and low back pain which radiated into both lower extremities. Tr. 541. A physical examination performed by Dr. Kraynak revealed that Muhaw had decreased range of motion of the lumbar spine with flexion 50 degrees and extension 15 degrees;[3] and Muhaw had sacroiliac joint tenderness bilaterally, positive bilateral straight leg raising tests, tenderness and pain in the right shoulder region, limited cervical range of motion, and muscular spasms in the cervical and thoracic areas. Id. Dr.

_____

[3]Normal lumbar spine flexion is from 80 to 105 degrees and extension 25 to 60 degrees. Normal Ranges of Motion Figures (in degrees), MLS Group of Companies,Inc.,http://www.mls-ime.com/articles/GeneralTopics/Normal%20Ranges%20of%20Motion.html.

Kraynak's impression was that Muhaw suffered from, inter alia, a lumbar strain with aggravation of a pre-existing herniated disc. Id. Dr. Kraynak prescribed the narcotic pain medication Darvocet and the muscle relaxant Skelaxin; limited Muhaw to light-duty work for a two-week duration; and scheduled a follow-up appointment. Id.

At the follow-up appointment with Dr. Kraynak which occurred on September 18, 2003, Muhaw continued to complain of neck and low back pain and also a burning sensation in her lower extremities. Tr. 542. Muhaw reported that the Darvocet did not help. Id. Physical examination findings were similar to those reported by Dr. Kraynak at the appointment on September 4, 2003. Id. In addition, it was stated that Muhaw walked with an antalgic gait.[4] Id. Dr. Kraynak ordered an MRI of Muhaw's lumbar spine to rule out progression of the herniated disc, imposed work restrictions. and prescribed the narcotic pain medication Percocet. Id.

The MRI which was performed on September 24, 2003, revealed a "[m]inimal nonsignificant bulge at T11-12" and "[m]ild disc desiccation [loss of water content] with bulging at L4-5 and L5-S1 without evidence of focal

_____

[4]Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary, 97 (32nd Ed. 2012).

disc herniation or spinal or foraminal stenosis." Tr. 308.

Muhaw had a follow-up appointment with Dr. Kraynak on October 14, 2003, at which Muhaw complained of severe neck and low back pain and a burning sensation in her lower extremities. Tr. 543. Physical examination findings were essentially the same as those observed at the previous appointment, including that Muhaw walked with an antalgic gait. Tr. 543. Muhaw was given a prescription for Percocet and referred to Mohammad Aslam, M.D, a neurologist for further evaluation. Id.

On October 28, 2003, Dr. Aslam physically examined Muhaw and performed nerve conduction studies and an electromyogram ("EMG") of Muhaw's lower extremities. Tr. 597-598.  The physical examination revealed that Muhaw had limited range of motion in the lumbosacral spine with a lot of paravertebral muscle spasm and trigger point tenderness; she was tender in the upper thoracic spine area; and straight leg raising tests were moderately painful. Id. The results of the EMG were suggestive of an L5 radiculopathy. Tr. 598. Dr. Aslam administered nerve blocks and trigger point injections to the spine and prescribed the nonsteroidal anti-inflammatory drugs Vioxx and Naprosyn and the muscle relaxant Flexeril. Id. Muhaw was also advised to use a Duragesic patch. Id.

From November 12, 2003, through September 9, 2005, Muhaw had 19 appointments with Dr. Kraynak and continued to complain of severe low back pain and a burning sensation in her legs. Tr. 544-562. The physical examination findings essentially remained unchanged or worsened during this period of time, including Muhaw walked with an antalgic gait, and had restricted range of motion of the spine, positive straight leg raising tests, and muscle spasms and tenderness. Id. Notably, on September 14, 2005, there was a worsening in Muhaw's lumbar range of motion to 40 degrees of flexion and 10 degrees of extension. Tr. 558. It was also noted that her bilateral side bending was 10 degrees. Id. During this period Muhaw was treated with multiple medications, including the Percocet, Flexeril, Ambien, Valium, Vicodin, Avinza/Kadian (morphine sulfate), Neurontin, and Topamax. Tr. 544, 546,548, 550-552, 560 and 562.

On or shortly after the appointment of September 9, 2005, Dr. Kraynak ordered an MRI of Muhaw's lumbosacral spine which was performed on September 28, 2005, and was reported to be an "abnormal MRI of the lumbosacral spine." Tr. 502-503. The MRI revealed the following: (1) evidence of degeneration, desiccation and some signal loss in the intervertebral disc of T 11-12 along with a posterior disc bulge which indented

14

the thecal sac posteriorly;[5] (2) minimal degenerative changes at the L4-L5 disc with a posterior bulge but no neural foramina stenosis; and (3) evidence at the L5-S1 level of degeneration, desiccation and posterior disc bulge to protrusion causing very minimal bilateral neural foramina stenosis although the nerve root seemed to be intact. Id.

On October 7, 2005, Muhaw had an appointment with Dr. Kraynak at which she complained of increasing pain in her low back which radiated to her lower extremities. Tr. 563. Dr. Kraynak reported that Muhaw continued to have severe limitation in her lumbar spine range of motion and spasms and tenderness in the low back. Id. He also stated that Muhaw's "[r]ight leg weakness is greater than left." Id. Dr. Kraynak continued to prescribed medications and referred Muhaw to a neurologist for an EMG and a nerve conduction study. Id. The electrodiagnostic testing was performed on October 24, 2005, by Michael H. Shuman, M.D., and the results were reported to be abnormal "chiefly from the EMG point of view with findings suggestive of

---

[5]The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which merely impinge the thecal sac without contacting nerve tissue do not cause pain symptoms. See Thecal Sac Impingement, Cure-Back-Pain.Org, http://www.cure-back-pain.org/thecal-sac-impingement.html.

irritation of the right lower lumbar and sacral nerve roots." Tr. 525-526.

On November 7 and December 12, 2005, and January 19, 2006, Muhaw had appointments with Dr. Kraynak. Tr. 564-566. Muhaw's complaints remained the same and there was no significant change in Dr. Kraynak's physical examination findings from those previously reported. Id. Dr. Kraynak continued to prescribe various medications and there is reference to adjustments made to the medication regimen because of medication side effects. Id. After the examination on January 19th Dr. Kraynak referred Muhaw to a neurologist for further evaluation. Tr. 566.

On February 8, 2006, Muhaw was examined by Jonas M. Sheehan, M.D., a neurosurgeon, at the Hershey Medical Center. Tr. 601-602. Dr. Sheehan conducted a physical examination of Muhaw and reviewed the MRI scan of September 28, 2005. Id. The objective physical examination findings reported by Dr. Jonas were essentially normal other than Muhaw had limited strength in the quadriceps of the right lower extremity and her lumbar range of motion was limited in all directions. Tr. 602. Dr. Sheehan reported that Muhaw had negative straight leg raising tests and that she was "unwilling to toe walk but [was] able to elevate on her toes quite well on the left side and in a more limited fashion on the right." Id. Dr. Sheehan stated that the MRI

scan revealed slight degenerative changes of the lumbar spine and "[t]here doesn't appear to be any substantial degenerative changes which would account for [Muhaw's] severe pain." Id. Dr. Sheehan further noted that he could not explain Muhaw's pain symptoms based on the MRI scan "aside from degenerative changes" and that her condition appeared to be a "relatively mechanical and soft tissue strain situation in her back which is likely to resolve without surgical intervention." Id. Dr. Sheehan stated that Muhaw's pain with respect to lumbar extension "indicate[d] possible facet arthropathy."[6] Id. Dr. Sheehan recommended that Muhaw be evaluated at a pain clinic. Id.

On February 22, May 1, and June 29, 2006, Muhaw had appointments with Dr. Kraynak. Tr. 567-569. Muhaw's physical complaints remained the same and there was no significant change in Dr. Kraynak's physical examination findings from those previously reported, including that Muhaw walked with an antalgic gait. Id. The treatment notes of these appointments reveal that Muhaw was also complaining of depression and Dr. Kraynak stated that "chronic pain syndrome can bring out depression." Tr. 567. Dr. Kraynak continued treating Muhaw with medications, including

---

[6]Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints.

antidepressants and stated in the notes of the June 29, 2006, appointment that he would continue to monitor Muhaw's progress. Tr. 569. However, after this appointment, there is a gap of almost a year in the medical treatment records contained within the administrative record.

The next medical record we encounter is from May 9, 2007. Tr. 497. On that date Muhaw had an appointment with Dr. Kraynak which was referred to as a regular check-up. Id. At that appointment Muhaw reported that she was in a motor vehicle accident. Id. She stated that she was the driver; she went off the road at approximately 30 miles per hour and hit a tree; and the airbag deployed. Id. She stated that she was not intoxicated and she did not hit her head but reported left knee and right elbow pain and increased back pain. Id. A physical examination revealed positive ecchymosis (bruising) of the right elbow; decreased range of motion of the left knee with mild swelling; decreased lumbar range of motion with positive spasms; and decreased range of motion of the cervical spine. Id. Dr. Kraynak's diagnostic assessment was status post motor vehicle accident causing increased low back pain and right elbow and right knee contusions. Id. Dr. Kraynak refilled Muhaw's prescriptions. Id.

Muhaw had a follow-up appointment with Dr. Kraynak on July 9,

2007, at which Muhaw complained of increased pain. Tr. 496.  Dr. Kraynak's diagnostic assessment was lumbar radiculitis and noted that he was waiting for the report of a recent MRI of the lumbar spine. Id. That MRI was performed on July 6, 2007, and was reported to be abnormal. Tr. 501. It revealed "a posterior disc protrusion to herniation at [the] L5-S1 [level] causing compression of the thecal sac in the midline and moderate bilateral nerve root canal stenosis." Id.

On August 14 and August 21, 2007, Muhaw received outpatient mental health counseling at The ReDCO Group, Behavioral Health Service, in Pottsville, Pennsylvania, under the supervision of Samuel Garloff, D.O., a psychiatrist. Tr. 386-388. On November 8, 2007, Dr. Garloff discharged Muhaw from the treatment program noting that Muhaw only attended two sessions. Tr. 384-385.  At the time of discharge, Muhaw was diagnosed as suffering from depressive disorder, not otherwise specified, and given a Global Assessment of Functioning (GAF) score of 60.[7] Tr. 384.

---

[7]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to

Muhaw had regular monthly appointments with Dr. Kraynak on August 30 and September 27, 2007, at which she continued to complain of severe low back pain. Tr. 494-495. Dr. Kraynak physical examination findings were essentially the same as previously reported, including Muhaw walked with an antalgic gait and had limited range of motion in the lumbar spine. Id. The treatment note of September 27, 2007, specifically indicates that Muhaw was suffering from a herniated nucleus pulposus at the L5-S1 level of the lumbar spine and she had limited activities of daily living. Tr. 494.

On November 17, 2007, Muhaw was evaluated by David F. O'Connell, Ph.D., a clinical psychologist, on behalf of the Bureau of Disability Determination. Tr. 256-260.  After conducting a clinical interview and mental status examination, Dr. O'Connell's Axis I diagnostic assessment was that Muhaw suffered from depressive disorder, not otherwise specified, with some symptoms of bipolar disorder; panic disorder without agoraphobia; and generalized anxiety disorder. Id.  Dr. O'Connell noted that Muhaw's mood was "one of moderate anxiety, profound depression." Tr. 258. Dr. O'Connell's Axis II diagnostic assessment was "avoidant personality features." He gave

---

70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

Muhaw a GAF score of 31, representing a major impairment in several areas such as thinking or mood. Tr. 259.

From November 21, 2007 through November 12, 2008, Muhaw had 14 appointments with Dr. Kraynak at which Muhaw continued to complain of low back pain. Tr. 279- 283, 286-292 and 539-540. Also, at some of these appointments Muhaw complained of neck pain, anxiety and depression. Id. The physical examination findings were very similar to those previously reported. Id. It was repeatedly stated that Muhaw walked with either an antalgic or stiff gait and she had decreased lumbar range of motion accompanied by muscular spasms and tenderness. Id. Dr. Kraynak repeatedly diagnosed Muhaw as suffering from lumbar radiculitis, anxiety and depression and prescribed multiple medications. Tr. 279- 283, 286-292 and 539-540.

The first appointment that Muhaw had with Dr. Kraynak after the alleged disability onset date of December 5, 2008, was on December 11, 2008. Tr. 284. That appointment was primarily to address an upper respiratory infection. Id. However, Dr. Kraynak did note that Muhaw walked with an antalgic gait. Id. Dr. Kraynak's diagnostic assessment was that Muhaw suffered from bronchitis, lumbar radiculitis and anxiety and he

continued to prescribed medications, including Percocet and Xanax. Tr. 284 and 579. At the next appointment with Dr. Kraynak on January 12, 2009, Muhaw continued to complain of low back pain and anxiety. Tr. 276.  Dr. Kraynak reported that Muhaw walked with an antalgic gait and had decreased range of motion in the lumbar spine accompanied by muscular spasms. Id. Muhaw was prescribed medications, including Xanax and Percocet. Id.

On January 13, 2009, Muhaw had an appointment with Myra B. Tolan, M.D., at the Geisinger Medical Center in Danville, Pennsylvania, based on a referral from Dr. Kraynak. Tr. 266-267. Although the record of this appointment states that it is a followup visit, our review of the administrative record did not reveal any other treatment records from Dr. Tolan.  Dr. Tolan reports that Muhaw had a history of lower back pain and that she injured her back while employed for Advance Auto Parts. Id. She further noted that Muhaw was working as a cook[8] and that she settled a Worker's Compensation claim but unfortunately continued to have lower back pain. Id. Muhaw at this appointment complained of low back pain radiating into the right lower extremity. Id. The results of a physical examination performed by

_____

[8]The earnings records do not reveal that Muhaw was working as a cook in January, 2009.

Dr. Tolan were essentially normal, including Muhaw "ambulate[d] with a non-antalgic gait." Id. Dr. Tolan in the report of this appointment also commented on an MRI of the lumbar spine of December 16, 2008. Id. She stated that it revealed mild degenerative changes and no significant canal or foraminal stenosis. Id. Our review of the administrative record did not reveal a report of this MRI. Dr. Tolan's diagnostic impression was "[m]ild lumbar degenerative disk disease with history of lumbar strain." Id. Dr. Tolan prescribed the nonsteroidal anti-inflammatory medications diclofenac and Voltaren gel (topical diclofenac) for Muhaw's lower back and prescribed the antidepressant drug Pamelor to commence two weeks after initiating diclofenac if Muhaw did not have sufficient relief. Id.

From February 9, 2009, through May 26, 2010, Muhaw had 19 appointments with Dr. Kraynak at which Muhaw continued to complain of low back pain. Tr. 272-275, 277-278, 285, 458-463, 468-471 and 489-490. Also, at some of these appointments Muhaw complained of anxiety, depression, sleep difficulties, fatigue and excessive daytime sedation. Id. The physical examination findings were very similar to those previously reported. Id. It was repeatedly stated that Muhaw walked with either an antalgic or stiff gait and she had decreased lumbar range of motion accompanied by muscular

spasms and tenderness. Id. On three occasions Dr. Kraynak specifically noted that Muhaw had positive straight leg raise tests in both lower extremities. Tr. 272, 458 and 462. Dr. Kraynak repeatedly diagnosed Muhaw as suffering from degenerative joint disease of the spine, lumbar radiculitis and anxiety and prescribed multiple medications. Tr. 272-275, 277-278, 285, 458-463, 468-471 and 489-490. Also, on October 19, 2009, Dr. Kraynak's diagnostic assessment was that Muhaw suffered from chronic pain syndrome and prescribed Savella. Tr. 489.

On January 13, 2010, at the request of Dr. Kraynak, Muhaw was examined by Glenn A. Miller, a physicians assistant at the Hershey Medical Center, apparently in presence of Vagmin P. Vora, M.D. Tr. 504-506. The physical examination performed by Mr. Miller revealed that Muhaw ambulated with a normal gait without the use of a cane or walker; Muhaw was able to walk on her heels and toes without difficulty; Muhaw had negative straight leg raising tests bilaterally; Muhaw's reflexes in the lower extremities were normal (2+); she had normal strength and sensation in the lower extremities; she was able to forward bend 45 degrees until she begin to have lumbar discomfort; she had increased lumbar discomfort with extension; and she was tender to palpation over the L5-S1 area. Tr. 505. The assessment was

that Muhaw suffered from low back pain and it was recommended that she begin physical therapy and continue receiving medications through Dr. Kraynak. Id.

On March 18, 2010, Muhaw was again examined at Hershey Medical Center at the request of Dr. Kraynak. Tr. 508-510.  The examination was performed by Marek Kurowski, M.D., and revealed that Muhaw's range of motion with respect to lumbosacral extension was extremely limited and produced acute lower back pain. Tr. 509.  The examination also revealed red papules visible on Muhaw's shins, elbows, and stomach; she had tenderness to palpation at the L4-L5 and L5-S1 levels of the lumbosacral spine; she had tenderness in the region of the right paraspinal muscles at the L5-S1 level overlying the facet joints; she had tenderness in the right sciatic notch; and there were palpable trigger points lateral to the right PSIS (posterior superior iliac spine). Id. Otherwise, the results of the physical examination were normal. Id. Dr. Kurowski's diagnostic assessment was that Muhaw suffered from "[c]hronic, long-standing, axial low back pain with a coexisting diagnosis of psoriasis" and "[p]ossible facet degeneration contributing to the axial low back pain as per examination." Id. Dr. Kurowksi recommended medial branch block injections at the right lumbar facet joints of L3, L4 and L5 levels of the

lumbar spine. Tr. 510.

On May 26, 2010, Dr. Kraynak noted that Muhaw had a mild decrease in her lower extremity strength and positive bilateral sacroiliac tenderness in addition to walking with an antalgic gait, muscular spasms, lumbar tenderness and decreased lumbar range of motion. Tr. 458. With respect to the diagnostic assessment, Dr. Kraynak stated that Muhaw suffered from lumbar radiculitis and had increased lower extremity symptoms and increased low back pain. Id. Dr. Kraynak refilled Muhaw's prescription for Percocet and ordered an MRI of Muhaw's lumbar spine. Id.

The MRI was performed on June 15, 2010, and was significantly different from the prior MRI reports. Tr. 498-499. It reported (1) cysts in the neural canals as well as cystic dilatations of the nerve root sleeves at several levels of the lumbar spine;[9] (2) at the L4-L5 level a right sided disc protrusion that significantly compresses the right anterior aspect of the thecal sac and partially effaces the perineural fat bilaterally; and (3) at the L5-S1 level a

_____

[9]The nerve root sleeves surround the nerve roots as they enter the neural foramina. A cystic dilatation involves an enlargement or expansion of the nerve root sleeve that may press against the nerve root. See Acosta, Frank L., M.D., et al., Diagnosis and Management of Sacral Tarlov Cysts, Medscape, http://www.medscape.com/viewarticle/461107; Nerve Root Sleeve, mediLexicon, http://www.medilexicon.com/medicaldictionary .php?t=59641.

broad based disc protrusion which impinges upon but does not compress the thecal sac. Id.  The MRI also revealed degenerative vertebral body endplate changes anteriorly at the L3-L4 level associated with small anterior vertebral endplate osteophytes (spurs). Id.  The conclusion of the MRI report stated that there were abnormal protrusions of the degenerative discs at the L3-L4, L4-L5 and L5-S1 levels as described and a very mild spinal stenosis at L3-L4 and L4-L5. Tr. 499. The ALJ did not mention this MRI report in her decision.

From June 23, 2010 through January 6, 2011, Muhaw had 8 appointments with Dr. Kraynak at which Muhaw continued to complain of low back pain with radiation of the pain to the lower extremities. Tr. 454-457 and 464-467. Also, at some of these appointments Muhaw complained of neck pain, anxiety, depression, sleep difficulties and fatigue. Id. The physical examination findings were very similar to those previously reported. Id. It was reported that Muhaw walked with either an antalgic or stiff gait and she had decreased lumbar range of motion accompanied by muscular spasms and tenderness. Id.  Also, on one occasion Dr. Kraynak specifically noted that Muhaw had positive straight leg raising tests in both lower extremities. Tr. 464. Dr. Kraynak repeatedly diagnosed Muhaw as suffering from degenerative joint disease of the spine, lumbar radiculitis and anxiety and

prescribed multiple medications.  Tr. 454-457and 464-467.

On September 27, 2010, Muhaw was examined at the request of Dr. Kraynak by Llewelyn A. Williams, M.D., at the Shamokin Area Community Hospital, Coal Township, Pennsylvania. Tr. 393-394.  The objective physical examination findings reported by Dr. Williams  were essentially normal other than significantly decreased lumbar flexion, some sacroiliac joint tenderness and some decreased motor strength bilaterally in the lower extremities. Tr. 393. The diagnostic impression was that Muhaw suffered from chronic pain syndrome and L5-S1 radiculopathy.Tr. 394. Dr. Williams recommended lifestyle changes, including smoking cessation, and physical therapy. Id.

On December 1, 2010, at the request of Dr. Kraynak,  Muhaw was examined at the Shamokin Area Community Hospital by Patrick T. Konitzer, M.D. Tr. 390-392. A physical examination revealed minimal cervical paraspinal tenderness to palpation; some pain beyond 20 degrees of lumbar flexion; a straight leg raise examination was difficult to perform on the right because the right leg would tighten up; and there was a positive Patrick's sign on the right.[10] Tr. 391. Otherwise, the results of the physical examination

---

[10]The Faber test or Patrick's test is a pain provocation test which reveals problems at the hip and sacroiliac regions. Faber is an acronym which stands for flexion, abduction and external rotation.

were essentially normal. Id. The diagnostic assessment was that Muhaw suffered from chronic low back pain and lumbosacral radicular pain as well as possible right-sided sacroiliitis. Id.

On January 17, 2011, Dr. Kraynak completed a medical source statement of Muhaw's worked-related functional abilities. Tr. 401-408. Dr. Kraynak limited Muhaw to less than the sitting, standing, walking, lifting and carrying requirements of full-time sedentary work. Id. Dr. Kraynak stated that the limitations that he assessed existed as of January 1, 2005. Tr. 407. Dr. Kraynak further stated that his assessment was based on, inter alia, Muhaw's medical history, clinical findings and laboratory and diagnostic testing. Tr. 401. The vocational expert who testified at the administrative hearing indicated that if Dr. Kraynak's limitation were accepted as an accurate reflection of Muhaw's functional ability that Muhaw could not perform any of the jobs which she identified in response to the ALJ's hypothetical questions. Tr. 56. The administrative record does not contain a medical source statement of Muhaw's work-related functional abilities from a state agency physician or other treating or examining physician which conflicts with Dr. Kraynak's statement.

The record reveals several mental health treatment plans, multiple

mental health therapy and medication management notes and four mental health evaluations. Tr. 341-371, 411-451 and 605-608

On October 27, 2009, Muhaw was evaluated by Christos Eleftherios, Ed.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 341-345.  After conducting a clinical interview and mental status examination, Dr. Eleftherios's diagnostic assessment was that Muhaw suffered from depression, mild to moderate, secondary to the chronic pain she was experiencing. Tr. 344. Dr. Eleftherios also completed a medical source statement of Muhaw's work-related mental abilities. Tr. 338-340.  Dr. Eleftherios found that Muhaw was slightly limited in her ability to interact appropriately with the public, supervisors and coworkers and moderately limited in her ability to respond appropriately to work pressures in a usual work setting and changes in a routine work setting. Tr. 339. Otherwise, Muhaw was not limited from a mental standpoint. Id.

On November 16, 2009, Salvatore Cullari, Ph.D., a psychologist, reviewed Muhaw's medical records on behalf of the Bureau of Disability Determination and concluded that she suffered from a depressive disorder, not otherwise specified but that it was a non-severe impairment. Tr. 346-356. Dr. Cullari stated that Muhaw had mild functional limitations with respect to

activities of daily living, maintaining social functioning and concentration, persistence or pace, and no repeated episodes of decompensation of an extended duration. Tr. 356.

In March, 2010, Muhaw commenced mental health therapy at New Beginnings in Mahanoy, Pennsylvania, and her treatment was supervised by Dr. Garloff. Tr. 451 and 608. From March 15, 2010, through January 10, 2011, Muhaw had 26 therapy sessions. Tr. 423-446 and 449.

On April 5 and July 5, 2010, Dr. Garloff approved outpatient services treatment care plans involving individual counseling and medication monitoring at New Beginnings for Muhaw which were prepared by clinicians on March 31 and June 28, 2010. Tr. 450-451. The Axis I diagnosis was major depressive disorder, recurrent, and intermittent explosive disorder. Id. Dr. Garloff concurred with the GAF score of 50 set forth in the plans. Id.

On August 2, 2010, Muhaw underwent a psychiatric evaluation performed by Dr. Garloff. Tr. 419-422. After performing a clinical interview and mental status examination, Dr. Garloff's diagnostic impression was that Muhaw suffered from major depression, recurrent, moderate and he could not rule-out bipolar disorder, depressed phase. Tr. 421. He gave Muhaw a GAF score of 50. Id. The antidepressant medications Wellbutrin and Trazodone

were prescribed. Id.

On September 20, 2010, Muhaw had a medication management appointment with Dr. Garloff at New Beginnings. Tr. 417-418. A mental status examination revealed that Muhaw's mood and affect were described as minimally anxious; her speech was rapid but not pressured; her psychomotor activity was good; she had no suicidal or homicidal ideations; and she had no thought disorders. Tr. 417. Dr. Garloff's diagnostic impression was that Muhaw suffered from major depression, recurrent, moderate, and he could not rule-out bipolar disorder and attention deficit disorder ("ADD") and he gave Muhaw a GAF score of 50 to 55. Id. Dr. Garloff discontinued Muhaw's prescription for Wellbutrin, renewed Trazodone and prescribed Strattera. Tr. 417-418.

On October 18, 2010, Dr. Garloff approved an outpatient services treatment care plan involving individual counseling and medication monitoring at New Beginnings for Muhaw which was prepared by a clinician on October 8, 2010. Tr. 448. The Axis I diagnosis was major depressive disorder, recurrent, moderate, rule-out ADD and rule-out bipolar disorder. Id. Dr. Garloff concurred with the GAF score of 50 to 55 set forth in the plan. Id.

Also, on October 18, 2010, Muhaw had a medication management

appointment with Dr. Garloff at New Beginnings. Tr. 415-416. A mental status examination revealed that Muhaw's mood was initially irritable and her affect was described as "with an edge" but she became calmer during the interview; her speech was not rapid or pressured and normal in content; her psychomotor activity was good; her vegetative functioning was good; she was not suicidal or homicidal; and she exhibited no thought disorders. Tr. 415. Dr. Garloff's diagnostic impression was that Muhaw suffered from major depression, recurrent, moderate, and he could not rule-out bipolar disorder and ADD and he gave Muhaw a GAF score of 55. Id. Dr. Garloff prescribed the drugs Risperdal, Trazodone and Straterra. Id.

On November 15, 2010, Muhaw had a medication management appointment with Dr. Garloff at New Beginnings. Tr. 413-414. A mental status examination revealed that Muhaw's mood and affect were "minimally better;" her speech was spontaneous; her psychomotor activity was good; her vegetative functioning was good; she was not suicidal or homicidal; and she exhibited no thought disorders. Tr. 413. Dr. Garloff's diagnostic impression was that Muhaw suffered from major depression, recurrent, moderate and he gave Muhaw a GAF score of 55+. Id. Dr. Garloff prescribed the drugs Risperdal, Trazodone and Straterra. Id. At a medication management

appointment on December 11, 2010, Dr. Garloff made similar mental status findings and his Axis I diagnosis was the same but he gave Muhaw a GAF score of 66. Tr. 411.

On January 17, 2011, Dr. Garloff approved an outpatient services treatment care plan involving individual counseling and medication monitoring at New Beginnings for Muhaw which was prepared by a clinician on January 10, 2011. Tr. 447. The Axis I diagnosis was major depressive disorder, recurrent, moderate, and Muhaw was given a GAF score of 66. Id.

On March 14, 2011, Dr. Garloff prepared a medical source statement of Muhaw's work-related mental functional abilities. Tr. 605-608. In that document Dr. Garloff stated that Muhaw was (1) mildly limited in her ability to remember locations, understand and remember very short and simple instructions, carry out short and simple instruction, sustain an ordinary routine without special supervision, make simple work-related decisions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others; (2)  moderately limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others

34

without being unduly distracted by them, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places or use public transportation; (3) moderately to markedly limited in her ability to be aware of normal hazards and take appropriate precautions; and (4) markedly limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure), complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Id.  Dr. Garloff stated that the date of onset of the above limitations was March 15, 2010. Tr. 607.

## DISCUSSION

The ALJ went through the five-step sequential evaluation process

and found at step five that Muhaw was not disabled.  The severe impairments found at step two were degenerative disc disease of the lumbar spine, scoliosis, anxiety and depression. Tr. 14. At step three, the ALJ found that Muhaw's impairments did not meet or medically equal the requirements of any listed impairment. Tr. 15. With respect to the residual functional capacity the ALJ found that Muhaw could perform a limited range of sedentary work. Tr. 17. Specifically, Muhaw could engage in sedentary work as defined in the regulations except she had to

> use a handheld assistive device when standing or walking, with the contralateral upper extremity used to lift and/or carry up to the sedentary exertional limit of ten pounds occasionally. The claimant can occasionally climb ramps or stairs, and never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch or crawl, and should avoid concentrated exposure to moving and hazardous machinery, and    unprotected heights. Further, she can perform simple, routine, and repetitive tasks, with no interaction with the public, and no more than occasional interaction with coworkers and supervisors.

Tr. 17. In setting this residual functional capacity, the ALJ rejected the opinion of Dr. Kraynak and referenced no contrary medical opinion regarding the physical exertional and nonexertional capabilities of Muhaw.

At step five based on the above residual functional capacity and the testimony of a vocational expert the ALJ found that Muhaw could perform

work as a surveillance systems monitor, visual inspector and assembler, and that there were a significant number of such positions in the national economy. Tr. 22.

Muhaw argues, inter alia, that the ALJ erred in failing to appropriately consider the medical evidence and give appropriate weight to the opinion of Dr. Kraynak. We have thoroughly reviewed the record in this case and find substantial merit in Muhaw's argument.[11]

The administrative law judge rejected the opinion of a treating physician regarding the physical functional abilities of Muhaw. The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical

---

[11]Muhaw also argues that the ALJ erred by (1) failing to find at step three that her impairments met or equaled the requirements of a listed impairment and (2) failing to find that her insomnia was a severe impairment. We find no merit in those arguments. In light of our disposition of this case, we need not elaborated further.

opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case the ALJ rejected the opinion of Dr. Kraynak and did not point to an assessment by a treating or examining physician specifying Muhaw's work-related physical functional abilities, such as sitting, standing, walking, lifting, and carrying, but engaged in her own lay analysis of the bare medical records and Muhaw's credibility. Moreover, the ALJ made erroneous factual findings to support her rejection of the opinion of Dr. Kraynak. She indicated that Dr. Kraynak throughout 2009 reported that Muhaw exhibited a normal gait and mildly decreased range of motion of the lumbar spine. She further stated that Dr. Kraynak from 2009 until 2011 did not report any changes in Muhaw's musculoskeletal or neurological symptoms and that he

did not change Muhaw's medications. The records do not support those findings. Also, the ALJ failed to address the MRI of Muhaw's lumbar spine performed in July, 2010, which was significantly different from prior MRIs. Dr. Kraynak treated Muhaw for at least 7 years and had a longitudinal picture of the progression of her impairments. The reasons given by the ALJ for rejecting the opinion of Dr. Kraynak were inadequate.

We recognize that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a). As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual

functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work.  The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination based on those administrative definitions and is reserved to the Commissioner. <u>However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of avocational expert if necessary, can translate that medical determination into a residual functional capacity determination.</u> Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by claimants, based upon their physical capacities. Thus, while agency regulations provide the ultimate issues such as disability and RFC are reserved to the agency, it may not reject a physician's medical findings that determine the various components and requirements of RFC.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 344-345 (2014)(emphasis added); <u>see also</u> <u>Woodford v. Apfel, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000)</u>("An ALJ commits legal error when he makes a residual functional capacity determination based

on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996)("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required."). The administrative law judge cannot speculate as to a claimant's residual functional capacity but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his determination. Id.; see also Yanchick v. Astrue, Civil No. 10-1654, slip op. at 17-19 (M.D.Pa. April 27, 2011)(Muir, J.)(Doc. 11); Coyne v. Astrue, Civil No. 10-1203, slip op. at 8-9 (M.D.Pa. June 7, 2011)(Muir,J.)(Doc. 21); Crayton v. Astrue, Civil No. 10-1265, slip op. at 38-39 (M.D.Pa. September 27, 2011)(Caputo, J.)(Doc. 17); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39(M.D.Pa. January 31, 2012)(Munley, J.)(Doc. 14); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46(M.D.Pa. February 15, 2012)(Conaboy, J.)(Doc. 10).

In this case there was no assessment of the functional capabilities of Muhaw from a physician which supported the administrative law judge's residual functional capacity assessment and the bare medical records and other non-medical evidence were insufficient for the administrative law judge

to conclude that Muhaw had the residual functional capacity to engage in a limited range of sedentary work on a full-time basis.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. §405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

Dated: July 30, 2014
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-2214-01.wpd